IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| JERRY LAWLER, as father, next friend and Personal Representative/Administrator of The Estate of BRIAN CHRISTOPHER LAWLER, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>HARDEMAN COUNTY, TENNESSEE; JOHN DOOLEN; LEONARD BROWN; ELLEN FUTRELL; WILLIAM GONZALEZ; AND JUDY WIGGINS,<br><br>    Defendants. | No. 1:19-cv-01174-STA-tmp |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 75) filed on June 20, 2022. For the reasons stated below, the Motion is **GRANTED IN PART AND DENIED IN PART** as follows: the Motion is **GRANTED** as to Defendants John Doolen and Leonard Brown and **DENIED** as to Defendants Ellen Futrell, Judy Wiggins, William Gonzalez, and Hardeman County, Tennessee.

**BACKGROUND**

The Court finds there is no genuine dispute as to the following facts, unless otherwise noted.[1]

---

[1] The facts are stated for the purpose of deciding this motion only.

1

At all times relevant, Defendant John Doolen was the Hardeman County Sheriff, Defendant Leonard Brown was the Hardeman County Jail Administrator, and Defendants Ellen Futrell, Judy Wiggins, and William Gonzalez were correctional officers in the Hardeman County Jail.

On July 7, 2018, a non-party Hardeman County Sheriff's Deputy arrested Brian Christopher Lawler ("Decedent") and took him to the Jail. Defendant Ellen Futrell booked Decedent into the Jail. As part of the booking process, Futrell completed a medical questionnaire form with Decedent. One question on the questionnaire asked "Have you attempted suicide in the past? If yes, how long ago? If 2 years or less call crisis." Decedent told Futrell that he had made multiple suicide attempts more than two years ago.[2] Futrell thus wrote "yes" for that question, which triggered the jail computer system to put Decedent on suicide watch. Futrell then changed the answer to that question to say "no," thus removing Decedent from suicide watch.[3] Decedent answered another question on the questionnaire asking if he was "currently thinking about suicide" "no." Decedent answered other questions asking if he had "a serious mental health condition that may need attention while you are here," "recently taken or been prescribed medication for emotional problems," "ever had a closed head injury that required hospitalization," and "experienced [delirium tremens] or withdrawals from drugs or alcohol" "yes." Decedent told Futrell that he suffered from bipolar disorder, and she put it in the notes of the questionnaire. Upon finishing the questionnaire, Decedent signed the medical questionnaire form and Futrell submitted

---

[2] Plaintiff alleges Decedent only told Futrell that he had attempted suicide more than two years ago, while Defendants allege he also told her those attempts were "in his 20s when he was experimenting." Pl.'s Resp. to Defs.' Statement of Undisputed Material Fact ¶ 12.

[3] Defendants allege that the Jail policy only required an inmate be placed on suicide watch if he had attempted suicide within the past two years, which is why Futrell changed the answer to that question to say "no." Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. 6. Plaintiff alleges that even in that case, Jail policy required Futrell to put in the notes of the questionnaire that the inmate had previously attempted suicide and that Futrell did not do so. Pl.'s Statement of Additional Undisputed Material Facts ¶ 7.

the form to the Jail nurse. Futrell never told any other jail staff that Decedent had previously attempted suicide.

On July 9, 2018, Nurse Jill Shearon saw Decedent for an initial physical evaluation. During the evaluation, Shearon reviewed the form Futrell had filled out two days prior. It is unclear whether Decedent told Shearon he had previously attempted suicide.[4] Shearon filled out an Admission Data/History and Physical Form with Decedent, which contained questions asking if Decedent had ever attempted suicide and had recently considered committing suicide. Shearon wrote "no" to both questions, and Decedent signed the form. Shearon concluded at the end of her evaluation that Decedent was not at risk for suicide.

On or about July 21, 2018, Plaintiff drove to the Jail with the intention of bailing Decedent out and met with Defendant John Doolen.[5] Doolen told Plaintiff that bailing Decedent out would be pointless because Decedent was charged with his third DUI offense, which carried a mandatory 90-day jail sentence, and Decedent would have to go right back to jail to serve his sentence anyway. Doolen also told him the Jail had a relationship with a rehabilitation facility to manage substance abuse that Decedent could go to and that he personally would help Decedent.[6] Plaintiff further alleges Doolen offered to get Decedent in drug court.[7] At some point during the

---

[4] Defendants assert he did. Defs.' Statement of Undisputed Material Facts ¶ 19. When asked in her deposition whether Decedent told her he had previously attempted suicide, Shearon first said Decedent had not, then said he had, then said she could not recall. Shearon Dep. 117-19.

[5] Defendants assert this happened "over a week prior to Decedent hanging himself." Defs.' Statement of Undisputed Material Facts ¶ 91. Plaintiff asserts it was approximately two weeks after Decedent was arrested. Lawler Dep. 176:5-8.

[6] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 92. Defendants assert Doolen told Plaintiff he could not provide Decedent drug rehabilitation services while in the Jail. Defs.' Resp. to Pl.'s Statement of Additional Undisputed Material Facts ¶ 14.

[7] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 92. Doolen asserts he told Plaintiff he would talk to the public defender and "try to get drug court" for Decedent. Defs.' Resp. to Pl.'s Statement of Additional Undisputed Material Facts ¶ 14.

conversation, Decedent joined Plaintiff and Doolen.  Doolen noticed Decedent was wearing tennis shoes with laces and said something to the effect of "we need to get you some of the jail flip flops."[8]  No one removed Decedent's tennis shoes or his shoestrings.  Doolen was not apprised of Decedent's mental health diagnoses or his prior suicide attempts.[9]  Following this conversation, Plaintiff decided not to bail Decedent out of the Jail.

On July 28, 2018, decedent was involved in a fight with another inmate and received a cut above his left eye.[10]  Defendant Judy Wiggins called Shearon to inform her of the incident.  Shearon requested a photograph of Decedent's cut, and Wiggins sent her a photograph via text message.  Shearon told Wiggins that the cut did not look "that bad" and told Wiggins to clean the wound and apply a butterfly bandage to it.  However, Decedent would not allow Wiggins to clean his wound or put a bandage on it.  Wiggins called Nurse Shearon to inform her of this, and Shearon came to the Jail to see Decedent herself.  Shearon applied a butterfly bandage to Decedent's cut.  She then evaluated Decedent for a concussion and found he did not have symptoms of a concussion.[11]  Shearon believed Decedent did not need to be sent to a hospital for further testing and instructed Wiggins to house Decedent in an intake cell until Monday, July 30, 2018.[12]

---

[8] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 92.  Doolen denies telling Plaintiff he would remove Decedent's shoestrings.  Defs.' Resp. to Pl.'s Statement of Additional Undisputed Material Facts ¶ 14.

[9] Plaintiff alleges that while Doolen did not know the specific mental health diagnoses Decedent had, "he knew [Decedent] needed help."  Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 93.

[10] Plaintiff asserts the cut also ran "down the side of his nose," that this was a "significant" cut, and that Decedent may have sustained a closed head injury because of the fight.  Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 34.

[11] Plaintiff stresses that while Shearon stated in her deposition that she performed such a test, she did not chart it.  Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 42.

[12] While Shearon states in her deposition that she told Wiggins to house Decedent in an intake cell, Wiggins states in her deposition that Shearon told her to house Decedent in an isolation cell.  Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 44.

Following Shearon's evaluation of Decedent, Wiggins placed him in Cell 90. Decedent yelled, cursed, and kicked the door of the cell for approximately six to seven hours, demanding to see a doctor and be placed back in his general population pod.[13] Wiggins heard him doing so, but never checked on him or tried to calm him down. While in Cell 90, Decedent never verbalized a threat of self-harm, an indication that he no longer wanted to live, or an intention to attempt suicide. Decedent stopped screaming and kicking the door approximately ten to fifteen minutes before he was found dead.

That evening, Defendant William Gonzalez took out the trash after dinner. On his way to take out the trash, Gonzalez stopped by Cell 90. Gonzalez observed what appeared to be Decedent standing on the cinder block bench in the corner of his cell with a towel hanging over his face and neck. Gonzalez attempted to speak with Decedent, but he did not respond. Gonzalez could not see Decedent's face or head due to the towel. According to Gonzalez, inmates covering their heads with towels was a "common trend" at the jail and many inmates had tried to hide in the corner in a similar manner, though he had never seen Decedent do either. He thus did not believe Decedent was suffering any medical emergency. Gonzalez also testified that he believed Decedent covered his face because he did not want to be seen due to the cut on his face. Gonzalez then proceeded to take the trash out.

After taking the trash out, Gonzalez returned to Decedent's cell and knocked on the cell door. Gonzalez observed Decedent positioned in the same manner as when he initially stopped by. When he again did not receive a response from Decedent, Gonzalez called Wiggins to come to Cell 90 and told her Decedent was not responding. Wiggins ordered Decedent's cell door

---

[13] Defendants assert that Decedent asked to be seen by a plastic surgeon. Defs.' Statement of Undisputed Material Facts ¶ 47. Plaintiff asserts he also asked to go to a hospital emergency room. Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 47.

opened.[14] When the door opened, Gonzalez and Wiggins entered the cell and observed Decedent hanging from one or both of his shoestrings that was tied to a bolt protruding out of the wall. Wiggins screamed for someone to bring scissors and attempted to hold Decedent up to relieve the pressure from the shoestring. Officer Lindsey Bolton ran into the cell with scissors and handed them to Gonzalez. Gonzalez climbed on the bench and cut Decedent down. After cutting Decedent down, Gonzalez and Officer Martha Daniel performed CPR on Decedent. Bolton called dispatch to have EMS dispatched to the Jail. EMS subsequently took over treatment and transported Decedent to the hospital. Decedent was pronounced dead the following day.

Prior to Decedent's death, neither Wiggins nor Gonzalez knew that Decedent had previously attempted suicide. Gonzalez did not know that Decedent suffered from bipolar disorder, though Wiggins had heard he did. Decedent never told any Jail employee that he was experiencing suicidal thoughts, desired to commit suicide, or planned to do so.[15] Nurse Shearon never instructed any correctional officers in the Jail to place Decedent on suicide watch. Prior to Decedent's death, no inmate had ever harmed himself with the bolts in the walls, which had been there since the Jail opened in 2010.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. A dispute is genuine if a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty*

---

[14] Plaintiff contends that Wiggins's first response to Gonzalez's call for assistance was that he was "probably faking." Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 60. Plaintiff further contends that three to four minutes elapsed from the time Wiggins said Decedent was "probably faking" and the time the door opened. *Id.* at ¶ 79.

[15] Defendants cite the entire record to support this claim. Defs.' Statement of Undisputed Material Fact ¶ 3-5. While Plaintiff correctly points out that such a citation is improper, he does not dispute this fact. Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 3-5.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must draw all reasonable factual inferences in favor of the non-moving party when deciding a Motion for Summary Judgment.  *Cox v. Ky. Dep't of Transp.*, 53 F. 3d 146, 150 (6th Cir. 1995).

## ANALYSIS

Plaintiff asserts one claim against each defendant—deliberate indifference to an excessive risk that Decedent would commit suicide in violation of the Fourteenth Amendment, brought under 42 U.S.C. § 1983.  Plaintiff has alleged theories of individual liability as to Defendants Futrell, Wiggins, Gonzalez, Doolen, and Brown, supervisory liability as to Doolen and Brown, and *Monell* liability as to Hardeman County.[16]  Defendants have moved for summary judgment as to all claims, alleging Plaintiff cannot demonstrate a genuine dispute of material fact as to whether Defendants were deliberately indifferent and that even if he could, the individual Defendants are entitled to qualified immunity.  Plaintiff does not oppose entry of summary judgment as to Brown, and the Motion is therefore **GRANTED** as to him.  The Court will analyze the remaining issues in turn.

### I.     Deliberate Indifference

To prevail on a § 1983 claim, a plaintiff must show (1) deprivation of a constitutional right and (2) that a person acting under color of state law caused the deprivation.  *Dominguez v. Corr. Med. Servs.*, 555 F. 3d 543, 549 (6th Cir. 2009).[17]

---

[16] Plaintiff has sued Doolen and Brown in both their individual and official capacities as officials of Hardeman County.  Because Hardeman County is also a party in this matter, the official-capacity claims against them must be dismissed as superfluous, for "[o]fficial-capacity suits are, for all intents and purposes, treated as suits against the municipality." *Shorts v. Bartholomew*, 255 Fed. App'x 46, 49 n.4 (6th Cir. 2007).

[17] Although Defendants assert in their Motion that "Plaintiff cannot show that any of the named individual defendants personally caused said constitutional deprivation," the Court finds that their arguments are more aptly characterized as disputing whether Decedent suffered a constitutional deprivation.  Causation is therefore not at issue in this case.

Prisoners have a right to adequate medical care under the Eighth Amendment, which includes a right to be free from deliberate indifference to an inmate's serious medical needs. *Brawner v. Scott Cnty., Tenn.*, 14 F. 4th 585, 591 (6th Cir. 2021). Pretrial detainees have an analogous right under the Fourteenth Amendment, which the Sixth Circuit has historically analyzed "under the same rubric" and held includes an objective prong, which requires a showing that the medical need is sufficiently serious, and a subjective prong, which requires a showing that an official subjectively knew of and disregarded an excessive risk to inmate health or safety. *Id.* However, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (holding that the differing language of the Eighth and Fourteenth Amendments necessitates differing analyses of excessive force claims for prisoners and pretrial detainees) the Sixth Circuit held that analysis of deliberate indifference claims by prisoners and pretrial detainees is no longer the same. *Id.* at 596-97.

To the extent that Plaintiff argues that *Brawner* abrogated the subjective prong for pretrial detainees, he is wrong. *Id.* ("*Kingsley* requires modification"—not elimination—"of the subjective prong of the deliberate-indifference test for pretrial detainees"). The new subjective component of the deliberate-indifference analysis for pretrial detainees requires a showing of "something akin to reckless disregard." *Id.* at 596-97. While the subjective component originally asked whether the jail official subjectively knew that the pretrial detainee faced a risk of harm from a serious medical need and disregarded it, the new subjective component asks whether (1) the official recklessly failed to act (2) even though a reasonable official would have known there was a serious

medical need. *Trozzi v. Lake Cnty.*, 29 F. 4th 745, 755-57 (6th Cir. 2022).[18] Thus, the complete deliberate indifference test for pretrial detainees is that

> a plaintiff must satisfy three elements for an inadequate-medical-care claim under the Fourteenth Amendment: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Id.* at 757-58.

Defendants do not dispute that Decedent had an objectively serious medical need, focusing the bulk of their briefing on the subjective prong. "Suicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F. 3d 612, 616 (6th Cir. 2005). Pre-*Brawner*, the Sixth Circuit took this unpredictability into account by holding that in suicide cases, the subjective prong required a showing that it was "obvious that there was a strong likelihood an inmate would attempt suicide," rather than "some *possibility* of suicide, or even a *likelihood* of suicide," and that the defendant disregarded this risk. *Downard for Estate of Downard v. Martin*, 968 F. 3d 594, 600-01 (6th Cir. 2020). The Sixth Circuit has not yet applied the new subjective prong in a suicide case, and the parties disagree whether the pre-*Brawner* standard in suicide cases is still good law following *Brawner's* modification of the subjective prong. The Court finds that it need not answer that question because even under the more rigorous pre-*Brawner* standard, Plaintiff has shown a genuine dispute of material fact as to Futrell, Wiggins,

---

[18] Plaintiff quotes *Westmoreland v. Butler Cnty., Ky.*, 29 F. 4th 721, 730 (6th Cir. 2022) for the proposition that "the analysis of whether [the Defendant officer] was deliberately indifferent should be solely an objective consideration." Plaintiff fails to mention that *Westmoreland* was a failure-to-protect case or that *Trozzi* distinguished it on that basis. *Trozzi*, 29 F. 4th at 757.

9

and Gonzalez. On the other hand, even under the more forgiving post-*Brawner* standard, Plaintiff has not shown a genuine dispute of material fact as to Doolen.

Factors that indicate a high risk of suicide include: (1) a history of alcohol and substance abuse, (2) feeling of hopelessness, (3) impulsive or aggressive tendencies, (4) isolation, (5) access to methods for suicide, (6) a history of mental illness, particularly clinical depression, and (7) prior traumatic brain injuries. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F. 3d 472, 484 (6th Cir. 2020). In analyzing the subjective prong, the Court must evaluate each Defendant individually and cannot impute knowledge from one defendant to another. *Greene v. Crawford Cnty., Mich.*, 22 F. 4th 593, 607 (6th Cir. 2022).

  **i.**  **Futrell**

Drawing all reasonable factual inferences in Plaintiff's favor, he has shown that Futrell knew Decedent had several risk factors for suicide and disregarded them. While she booked him, Decedent told her he had attempted suicide multiple times in the past, albeit more than two years ago. He told her he had serious mental illness, specifically bipolar disorder. He told her he had a traumatic head injury requiring hospitalization in the past. He told her he had experienced delirium tremens or withdrawals from drugs or alcohol. Not only did Futrell fail to communicate to anyone else within the Jail that Decedent might be a suicide risk, or even fail to put him on suicide watch, she intentionally changed the answer to one of the questions on the questionnaire to take him off suicide watch. It may be that Jail policy dictated she do this because the attempts were more than two years prior, but Officer Martha Daniel, a fellow guard at the Jail, testified that even in that case, officers are trained to make a note on the questionnaire about the prior attempts.

Defendants try to get around this issue by arguing that she was justified in failing to tell anyone of Decedent's suicide risk because she knew Shearon would evaluate Decedent later.

While it is true that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable" with deliberate indifference, in each Sixth Circuit case Defendants cite, all defendants who were granted summary judgment (with the exception of one guard who was sued after a prisoner died during her first day on the job) at least informed someone of the decedent's health issues. *See Smith v. County of Lenawee*, 505 Fed. App'x 526, 532-37 (6th Cir. 2012); *Shaver v. Brimfield Twp.*, 628 Fed. App'x 378, 383 (6th Cir. 2015). Futrell failed to tell anyone that Decedent was a suicide risk, and therefore had reason to believe that he was not being treated for his suicidal tendencies. Thus, there is a genuine dispute as to whether Futrell recklessly disregarded an excessive risk that Decedent would commit suicide.

      **ii.    Wiggins**

Drawing all reasonable factual inferences in Plaintiff's favor, he has shown Wiggins knew Decedent had several risk factors for suicide and disregarded them. She listened to Decedent scream and kick the door of his cell for six to seven hours after she put him in there by himself, making it readily apparent he had aggressive tendencies and was isolated. She had "heard" he suffered from bipolar disorder. She knew he had his shoelaces, which she admits she would have taken if he was on suicide watch. Yet she never checked on him or informed anyone of his drastic mood swing, even after the screaming and kicking suddenly stopped. Moreover, Plaintiffs have put forward evidence that her first response to Gonzalez's call for assistance was that he was "probably faking," which allegedly delayed treatment by three to four minutes that could have been the difference between Decedent being deceased and alive.

Defendants argue Wiggins was also justified in disregarding Decedent's suicide risk because she ensured Decedent saw Shearon for his cut and followed her orders in placing him in

11

Cell 90 away from general population, but this argument again fails. Even if Wiggins was justified in placing Decedent in Cell 90 based on Shearon's orders, she listened to him scream and kick the door of the cell for six to seven hours without even checking on him herself, much less informing Shearon of this sudden, drastic, and violent mood swing, thereby failing to place him in the "capable hands" of a medical professional at a time he needed it. Moreover, there is evidence indicating that when Gonzalez called for assistance upon finding Decedent unresponsive, rather than ensure Decedent was in "capable hands," Wiggins blew off his call for help because, in her words, Decedent was "probably faking." Plaintiff has thus shown that a reasonable jury could find she recklessly disregarded a strong likelihood Decedent would die by suicide.

### iii. Gonzalez

Taking the facts in the light most favorable to Plaintiff, Gonzalez looked inside Decedent's cell during or just after a suicide attempt and walked away to take out the trash. He saw Decedent standing on the bench with a towel over his head. He even knocked on the door and received no response from Decedent before walking away. His explanation for doing so, that it was a "common trend" at the Jail to cover one's head with a towel and to hide in the corner of a cell, stretches credulity. But it is the province of a jury to decide questions of credibility. A reasonable jury could find that Gonzalez recklessly disregarded a strong risk that Decedent would die by suicide.

### iv. Doolen

Plaintiff has failed to show even that a reasonable officer in Doolen's shoes should have known Decedent was at risk of suicide. The only allegations Plaintiff makes against Doolen in his individual capacity are that he told Plaintiff that Decedent would have to go back to jail even if he bailed him out, misrepresented that there was a drug or alcohol rehabilitation facility connected to the jail, promised to get Decedent into drug court, and commented on Decedent's wearing tennis

shoes. Plaintiff does not allege that Doolen knew of any of Decedent's mental health diagnoses or past suicide attempts, aside from a vague and conclusory allegation that he "knew [Decedent] needed help." The alleged comment about Decedent's shoes does not indicate Doolen knew or should have known he might use the laces to hang himself; Doolen could just as easily have been concerned that Decedent might use them for any number of other improper purposes. Given that Doolen knew nothing about Decedent's mental health or suicide history, he cannot reasonably have been expected to know Decedent was at risk of hanging himself with the shoelaces. At most, Plaintiff has shown that a reasonable officer in Doolen's shoes would have known Decedent had a drug or alcohol problem. He has not shown Doolen should have known that Decedent was at risk of committing suicide.

Plaintiff's failure-to-train theory directed at Doolen likewise cannot survive summary judgment. A supervisory official's failure to supervise, control, or train a subordinate is not actionable unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *Peatross v. City of Memphis*, 818 F. 3d 233, 242 (6th Cir. 2016). At minimum, a plaintiff must show the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* Plaintiff fails to even argue Doolen did so. His failure-to-train claim directed at Doolen "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell County, Tenn.*, 453 Fed. App'x 557, 563 (6th Cir. 2011) (citing *Miller v. Calhoun Cnty.*, 408 F. 3d 803, 817 n.3 (6th Cir. 2005) ("absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed brought against them in their official capacities, to be treated as claims against the county")). Plaintiff implicitly acknowledges this in Footnote 8 of his Response to Defendants' Motion for Summary

Judgment, in which rather than argue his failure-to-train theory against Doolen, he refers the Court to his argument for holding the County liable.

For the foregoing reasons, the Motion is **GRANTED** as to Doolen.

## II.     Qualified Immunity

Having established that Plaintiff has stated a genuine issue of material fact as to whether Futrell, Wiggins, and Gonzalez violated Decedent's constitutional rights, the Court must determine whether they are entitled to qualified immunity. To do so, the Court must determine whether Decedent's constitutional right to be free from deliberate indifference to his suicide risk was clearly established such that reasonable officials in the defendants' positions would have understood that they were violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). For the following reasons, the Court finds that Decedent's constitutional right is clearly established, and Futrell, Wiggins, and Gonzalez are not entitled to qualified immunity.

A right is clearly established when existing precedent has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Existing precedent need not be precisely on point, but it must be clear enough that any reasonable official under the circumstances would have understood he was violating a constitutional right. *Ouza*, 969 F. 3d at 279. Plaintiff does not need to show the Court a "fundamentally similar" or "materially similar" case for a clearly established right to apply. *Schultz v. Sillman*, 148 Fed. App'x 396, 404 (6th Cir. 2005). The key inquiry is "whether a *right* is clearly established;" a court should not "hon[e] in on the *specific act*" at issue. *Linden v. Washtenaw Cnty.*, 167 Fed. App'x 410, 425 (6th Cir. 2006). The right of a detainee to be screened for suicidal tendencies and the right to have steps taken that would have prevented suicide is a particularized right that the Sixth Circuit has long held is clearly established. *Id.* (citing *Barber v. City of Salem*, 953 F. 2d 232, 239-40 (6th

14

Cir. 1992); *Danese v. Asman*, 875 F. 2d 1239, 1244 (6th Cir. 1989); *Molton v. City of Cleveland*, 839 F. 2d 240, 243 (6th Cir. 1988). Thus, viewed in the light most favorable to Plaintiff, Defendants Futrell, Wiggins, and Gonzalez violated Decedent's clearly established right to be free from deliberate indifference to an excessive risk of suicide.

For the foregoing reasons, Futrell, Wiggins, and Gonzalez are not entitled to qualified immunity, and the Motion is **DENIED** as to these defendants.

### III.    *Monell* Liability

Finally, the Court must determine whether Hardeman County can be held liable for its employees' violations of Decedent's rights. Local government units such as counties are liable for violations of constitutional rights by their employees where a policy, practice, or custom of the county causes a constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A plaintiff may show a municipality caused a constitutional violation in one of four ways: the existence of an illegal official policy or legislative enactment, that an official with final decision-making authority ratified illegal actions, the existence of a policy of inadequate training, or the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v. Fischer*, 735 F. 3d 462, 478 (6th Cir. 2013).

Plaintiff first alleges a policy of inadequate training on suicide prevention. A plaintiff may show a custom of inadequate training or supervision where: (1) the training or supervision was inadequate for the tasks involved, (2) the inadequacy was the result of the municipality's deliberate indifference, and (3) the inadequacy was closely related to or caused the injury. *Ouza v. City of Dearborn Heights, Mich.*, 969 F. 3d 265, 286-87 (6th Cir. 2020). Defendants allege Plaintiff cannot show a genuine dispute of material fact as to the first two elements of this test. The Court disagrees.

Defendants' assertions that there is no genuine dispute that their suicide prevention training is adequate because it complies with Tennessee Corrections Institute standards is unconvincing. Defendants' assertion that "the Jail's training included regular training on suicide prevention" fails to explain what this training consists of, how often this training takes place, or even how many hours of the Jail's yearly training consists of suicide prevention training. Moreover, Plaintiffs have pointed to several instances of jail employees testifying about inadequacies in the Jail's training. Futrell testified she was not trained to write a note on the intake questionnaire about Decedent's past suicide attempts from more than two years prior.[19] Nurse Shearon testified she has had no suicide risk assessment training since 1984.[20] Wiggins testified she was trained that she only needed to put an inmate on suicide watch if he actually told her "I'm going to kill myself."[21] Gonzalez testified he was not trained to ensure an unresponsive inmate is ok.[22] Plaintiff has thus put forward evidence from which a reasonable jury could find that the Jail's suicide prevention training was inadequate.

Defendants' assertion that there is no genuine dispute that Hardeman County was not deliberately indifferent also falls flat. A plaintiff may prove that the inadequacy was the result of the municipality's deliberate indifference in one of two ways: by showing that the municipality has failed to act when it was aware of repeated prior instances of unconstitutional conduct, or by showing that "the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the [municipality] to fail to prepare officers for it." *Ouza*, 969 F. 3d at 286. Though Plaintiff put forward no evidence of repeated prior constitutional violations,

---

[19] Futrell Depo. 83:12-15.
[20] Shearon Depo. 44:19-21.
[21] Wiggins Depo. 128-29.
[22] Gonzalez Depo. 113-14.

Plaintiff has shown that a reasonable jury could find it was "obvious" to Hardeman County that a Jail inmate would commit suicide. Though Defendants argue the County was not deliberately indifferent because it provided suicide training in compliance with TCI standards, the fact that it provides such training is evidence from which a jury could find it foresaw the possibility of an inmate attempting suicide and thus foresaw the risk of a constitutional violation in the event its employees were inadequately trained to handle it. Moreover, it is obvious that a suicidal inmate who has his shoelaces in a cell with bolts protruding from the wall might hang himself, yet the Jail did nothing about the bolts for eight years prior to Decedent's suicide and allowed inmates to keep their shoelaces unless they were put on suicide watch, which at least one officer (Wiggins) was allegedly trained to not put inmates on unless the inmate said "I'm going to kill myself," regardless of any other suicide risk factors the inmate displayed. Thus, a reasonable jury could find Hardeman County's inadequate training was due to deliberate indifference.

Plaintiff also alleges ratification of illegal actions by Hardeman County, but this theory fails. Mere approval of illegal behavior after the fact cannot establish liability; ratification of an illegal action must be a "moving force" behind a constitutional violation, meaning it must occur before the illegal conduct at issue. *Buckley v. City of Memphis*, 2004 U.S. Dist. LEXIS 7773, at *12 (W.D. Tenn. May 4, 2004) ("Ratification occurs *after* the conduct, making the municipality's ratification of the incident in question unable to be the moving force *before* the conduct."). Thus, Plaintiff's argument that "[i]n [Doolen's] deposition he repeatedly approved of [Futrell's, Shearon's, Wiggins's, and Gonzalez's] behavior" is insufficient to establish liability via ratification.

For the foregoing reasons, the Motion is **DENIED** as to Hardeman County.

## CONCLUSION

For the reasons stated above, the Motion is **GRANTED IN PART AND DENIED IN PART** as follows: the Motion is **GRANTED** as to John Doolen and Leonard Brown and **DENIED** as to Ellen Futrell, Judy Wiggins, William Gonzalez, and Hardeman County, Tennessee.

**IT IS SO ORDERED.**

       **s/ S. Thomas Anderson**
       S. THOMAS ANDERSON
       CHIEF UNITED STATES DISTRICT JUDGE

Date: September 29, 2022.