**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| JERRY LAWLER, as father, next friend and Personal Representative/Administrator of the Estate of BRIAN CHRISTOPHER LAWLER deceased,<br><br>    Plaintiff,<br><br>v.<br><br>HARDEMAN COUNTY, TENNESSEE; JOHN DOOLEN; LEONARD BROWN; ELLEN FUTRELL; WILLIAM GONZALEZ AND JUDYWIGGINS,<br><br>    Defendants. | Case No. 1:19-cv-1174-STA-tmp |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT
REBECCA E. LUETHY (ECF NO. 69)
ORDER DENYING DEFENDANTS' MOTION TO EXCLUDE PORTIONS OF
THE OPINIONS OF PLAINTIFF'S EXPERT ROY T. GRAVETTE (ECF NO. 70)**

Defendants Hardeman County, Tennessee, John Doolen, Leonard Brown, Ellen Futrell, William Gonzalez, and Judy Wiggins have filed two Motions to Exclude the opinion testimony of two expert witnesses retained by Plaintiff Jerry Lawler. Defendants have moved to exclude Plaintiff's proposed expert Rebecca E. Luethy (ECF No. 69) and Roy T. (Tim) Gravette (ECF No. 70). Plaintiff has filed responses to both motions (ECF No. 77, 78), and Defendants have filed reply briefs to each response. (ECF No. 84, 85.) For the reasons set forth below, the motion to exclude Luethy's testimony is **PARTIALLY GRANTED** and **PARTIALLY DENIED**, and the motion to exclude portions of Gravette's testimony is **DENIED**.

## BACKGROUND

The background of the case is as follows. Plaintiff Jerry Lawler filed this action in the Circuit Court of Hardeman County, Tennessee, pursuant to 42 U.S.C. § 1983. Plaintiff alleges Defendants were deliberately indifferent to the serious medical needs of his now deceased son, Brian Lawler ("the Decedent"), by failing to provide adequate medical/mental health care to the Decedent while he was incarcerated. On August 29, 2019, Defendants removed the case to this Court.

On July 7, 2018, a Hardeman County Sheriff's Deputy arrested Brian Christopher Lawler (the "Decedent") for driving under the influence and other related charges.[1] After arresting him, the deputy took the Decedent to the Hardeman County Jail. Officer Ellen Futrell booked and processed the Decedent. In the course of the intake questions, the Decedent allegedly told Officer Futrell that he had previously attempted suicide and that he had a history of depression and anxiety. He informed Officer Futrell that he was taking a number of prescribed medications for depression, anxiety, pain, and inflammation.

Jail employee Sgt. Judy Wiggins was also allegedly aware of the Decedent's mental health diagnoses but never referred him to a mental health professional. In her deposition, she testified that the Decedent was screaming on the day of his suicide from 11:00 a.m. until 6:30 p.m., but she did not get him medical or mental health assistance because he did not actually state he wanted to hurt himself. Wiggins Depo. pp. 77, 90-9 (ECF No. 78-4.) Sgt. Wiggins testified that, according to her training, she only calls for mental health treatment when the detainee is threatening suicide and she is trained not to put anyone on suicide watch unless there is an actual verbal threat of suicide. *Id.* at pp. 77-78. During her eight years at the Hardeman County Jail, she was unaware of

---

[1] The facts are stated for the purpose of deciding this motion only.

any rehabilitation services or detox protocol for inmates with drug or alcohol dependency. *Id.* at pp. 122-123. Despite Hardeman County's Provider Treatment Protocols requiring jail medical staff to be a Registered Nurse or EMT Paramedic, the Decedent was placed in the care of Jill Shearon who was an LPN. Shearon Depo. p. 14 (ECF No. 78-3); Luethy Report p. 5 (ECF No. 78-1.) Shearon was informed that the Decedent took Methamphetamine, Oxycodone, and Xanax when he was not incarcerated, but she did not begin a detox protocol. Shearon Depo. pp. 89-90, 99-100, 123, 207, 209. Shearon was aware of the Decedent's diagnosis of bipolar disorder and major depressive disorder, but she did not refer him to Mental Health or schedule him to see a provider. *Id.* at pp. 98, 122, 103.

On July 28, 2018, the Decedent allegedly had a physical altercation with another detainee and suffered a head injury and open wound but did not receive medical attention. He allegedly asked Nurse Shearon and others to take him to the hospital because he thought he had a concussion. *Id.* at pp. 158, 160, 215. Nurse Shearon and others refused his requests. Complaint (ECF No. 1-2, ¶ 29.) The Decedent was then put in an isolation cell. Shearon Depo. pp. 129, 215-216; Wiggins Depo. pp. 37-38, 47. The cell where the Decedent was placed contained numerous large bolts protruding from the upper portion of the wall. The Decedent was allowed to keep his shoes with shoelaces in this room. Complaint, ¶ 32. While the Decedent was in the isolation cell, a county employee observed him with a towel over his head and face. The employee knocked on the cell door or window, but the Decedent did not respond. The employee took the garbage out, and, when he returned, he knocked again and there was still no response. Finally, he called for help from Sgt. Wiggins. Gonzalez Depo. pp. 59, 63, 75, 86 (ECF No. 78-6.) When they went into the cell, they found the Decedent hanging by his shoelace which was attached to a bolt in the cell wall. He was later pronounced deceased by suicide.

### I.      Rebecca E. Luethy

On October 27, 2021, Plaintiff disclosed Rebecca E. Luethy, MSN, RN, LNC, CCHP, as a proposed expert and provided a copy of the "Opinions, Case Chronology, and Clinical Notations Summary of Medical Records, Depositions, Reports, and other Documents" prepared by Luethy regarding her opinions (the "Report"). (ECF Nos. 78-1, 78-2.) Attached to her Report is her Curriculum Vitae setting forth her educational and practical experience in correctional health care. She is a Registered Nurse, she possesses a Master of Science degree in nursing, she is a Clinical Nurse Specialist, and she has earned certification as a Certified Correctional Healthcare Professional ("CCHCP") which is awarded by the National Commission on Correctional Healthcare following a proctored examination. Luethy Depo. pp. 34, 164. She obtained a certificate in legal nurse consulting, and she is a member of numerous professional organizations relating to correctional healthcare.

Luethy has served as an expert witness many times, including approximately seventeen cases during the four years preceding the submission of her disclosure as an expert in this case. She testified that, to her knowledge, no court has ever excluded or limited her expert testimony. Luethy Depo. pp. 39-40 (ECF No. 78-5.) She has lectured and written on the subject of correctional healthcare. From 1985 until 2011, she worked in various capacities for Correctional Medical Services, Inc. (now Corizon Health) which is a privately-held organization that provides healthcare services in prisons and jails nationally. From 2011 to the present time, she has worked for Centurion Health, LLC, which is an organization that provides healthcare services in prisons and jails across the nation. Currently, Luethy is the Vice President for Strategic Development which includes, among other responsibilities, developing and introducing strategic solutions for the delivery of health services in correctional facilities. She manages the company's clinical

innovation committee which reviews platforms and products for use in correction facilities to improve the outcomes of their patients' healthcare. *Id.* at p. 22.  Defendants do not dispute these credentials.

Luethy reviewed jail records, medical records and depositions taken in this matter to assist her in rendering opinions set forth in her Report as well as in her deposition taken by defense counsel. She lists all the materials she reviewed in her Report and in the portion of her Report titled "Case Chronology- Summary of Medical Records, Reports and other Documents."

Defendants have summarized the three primary opinions provided by Luethy within the Report as follows: (1) the Decedent was denied access to medical care at the Jail; (2) the Decedent's "serious medical needs" were ignored or treated with a "laissez faire" attitude, "reflecting deliberate indifference, which was a substantial factor in causing his death"; and (3) "blatant disregard towards [the Decedent's] serious medical need shows breach of standard of care toward [the Decedent's] fragile health status and as evidenced by administrative nonadherence to the jail's Healthcare Provider Treatment Protocols (dated 2017) and by LPN Shearon ignoring those protocols." Luethy Report, pp. 3 – 5.

Defendants contend that Luethy's opinions should be excluded under Rule 26(a)(2) of the Federal Rules of Civil Procedure and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993), because (1) she is not qualified to offer opinions about correctional standards or the actions of correctional officers; (2) Luethy's opinions as to the actions/inactions of Nurse Shearon are irrelevant in that Nurse Shearon is not a party to the action; (3) Luethy is not qualified to give an opinion as to the Decedent's cause of death; (4) portions of Luethy's opinions are legal conclusions that invade the province of the trier of fact.

## II.     Roy T. (Tim) Gravette

On October 27, 2021, Plaintiff disclosed Roy T. (Tim) Gravette as an opinion witness and provided a copy of Gravette's written expert report. Defendants have made the report and the disclosure exhibits to their Motion to Exclude. In his report, Gravette opines in part on the actions of Nurse Jill Shearon, LPN, specifically faulting her for failing to contact "a physician or a nurse practitioner" regarding injuries Plaintiff's decedent sustained in an altercation and to consult about whether the Decedent required additional medical intervention. Gravette's report offers a separate opinion that Defendant William Gonzalez's failure to act during the time period before Plaintiff's decedent's suicide resulted in the hanging and death of the Decedent.

Defendants now seek the exclusion of Gravette's opinions about Nurse Shearon and Deputy Gonzalez. First, Gravette is not qualified to offer opinions about medical care. Plaintiff has tendered Gravette as an expert in corrections, not medicine or nursing care. His opinion that Nurse Shearon should have contacted a nurse practitioner or medical doctor is outside his area of expertise. As for Gravette's opinions about Deputy Gonzalez, Gravette opines that had Gonzalez intervened when he first saw Brian Lawler with a towel over his head in his cell, Gonzalez could have prevented Lawler's death. Defendants argue that Gravette's opinion amounts to an opinion concerning Lawler's cause of death. Just as with his medical opinions about Nurse Shearon's actions, Gravette lacks any qualifications to opine on the cause of Lawler's death.

Plaintiff has responded in opposition that Gravette's opinions concern correctional practices. As a matter of procedure, Plaintiff argues that the Court should reserve ruling on the issues until Plaintiff has presented evidence to lay a foundation for Gravette's opinions and the Court can hear Gravette's testimony for itself. On the merits Plaintiff answers that Gravette is

qualified to offer the contested opinions by virtue of his experience in corrections. Gravette's opinions about Nurse Shearon are properly characterized not as medical opinion but opinion about appropriate correctional policies, particularly in response to medical emergencies and suicide prevention. As for the Decedent's cause of death, Gravette is not offering an opinion on that subject. The parties have actually entered into a stipulation on this point. Gravette testified about Deputy Gonzalez's actions and his failure to address Brian Lawler when he first saw him with a towel over his head standing on a bench in his cell. Plaintiff contends then that the Court should deny the Motion or at least reserve ruling on it until trial.

Defendants have filed a reply brief, reiterating most of the same points raised in their opening brief. Defendants do add that Gravette's own deposition testimony shows why his opinion about Deputy Gonzalez is inadmissible. Gravette admitted in his deposition that he did not know when Brian Lawler took his own life. As a result, Gravette cannot say that Deputy Gonzalez could have prevented the suicide if he had acted appropriately.

## STANDARD OF REVIEW

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony. Rule 26(a)(2)(B) provides that the disclosure of witnesses who are retained or specially employed to provide expert testimony must be accompanied by a written report containing a complete statement of all opinions the witness will express and the basis and reasons for them. Fed. R. Civ. P. 26(a)(2)(B)(1). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Federal Rule of Evidence 702 requires that trial courts perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert*, 509 U.S. at 597. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 applies not only to scientific testimony, but also to other types of expert testimony based on technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999). The Court's gate-keeping role is two-fold. First, the Court must determine whether the testimony is reliable. *Daubert*, 509 U.S. at 590. The reliability analysis focuses on whether the reasoning or methodology underlying the opinion is scientifically valid. *Id.; see also Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014). "To be reliable, the opinion must not have 'too great an analytical gap' between the expert's conclusion, on the one hand, and the data that allegedly supports it, on the other." *Lozar v. Birds Eye Foods, Inc.*, 529 F. App'x 527, 530 (6th Cir. 2013) (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675–76 (6th Cir. 2010)). The proponent of the testimony does not have the burden of establishing that it is correct, but that, by a preponderance of the evidence, it is reliable. *Rose v. Matrixx Initiatives, Inc.*, 2009 WL 902311, at *5 (W.D. Tenn. Mar. 31, 2009).

To aid the trial courts in their determination of whether an expert's testimony is reliable, the Supreme Court in *Daubert* set forth four non-exclusive factors for the courts to consider: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been

subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Daubert*, 509 U.S. at 593-94; *see also Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397, 403 (6th Cir. 2012). In addition, the Court may consider "whether the proposed testimony grows [out] of independent research or if the opinions were developed 'expressly for the purposes of testifying.'" *Siegel*, 501 F. App'x at 403 (quoting *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (*abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500 (6th Cir. 1998))).

The Supreme Court has emphasized that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial court may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability. *Kumho Tire*, 526 U.S. at 150. The test of reliability is a "flexible" one, however, and the *Daubert* factors do not constitute a "definitive checklist or test," but must be tailored to the facts of the particular case. *Id.* (quoting *Daubert*, 509 U.S. at 593); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470 (6th Cir. 2004). Moreover, the Sixth Circuit has explained that the *Daubert* factors "'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Gross v. Comm'r of Internal Revenue*, 272 F.3d 333, 339 (6th Cir. 2001)).

When nonscientific expert testimony is involved, the Court's analysis may focus upon the expert's personal knowledge or experience, because "the factors enumerated in *Daubert* cannot readily be applied to measure the reliability of such testimony." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (citing *Kumho Tire*, 526 U.S. at 150 and

*First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001)); *see also United States v. Jones*, 107 F.3d 1147, 1155 (6th Cir. 1997) (reasoning that "a non-scientific expert's experience and training bear a strong correlation to the reliability of the expert's testimony").

The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, in other words, the court must determine if the opinion is relevant. *Daubert*, 509 U.S. at 591-93. This relevance requirement ensures that there is a "fit" between the proffered testimony and the issues to be resolved at trial. *See United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993); *Brock v. Positive Changes Hypnosis, LLC*, 589 F. Supp. 2d 974, 980 (W.D. Tenn. 2008).

Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant. The rejection of expert testimony, however, is the exception rather than the rule, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note (2000)) (quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## ANALYSIS

### I. Motion to Exclude Luethy

Defendants first argue that Luethy cannot offer opinions concerning correctional standards for correctional officers and was not retained to do so but, instead, may only give opinions about nursing. In support of their argument, Defendants correctly recite the law that a witness must establish her expertise by reference to "knowledge, skill, experience, training, or education" in

10

order to qualify as an expert under Rule 702. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Kush Enterprises, LLC v. Massachusetts Bay Ins. Co.*, 2021 WL 3007263, at *6 (E.D. Tenn. July 15, 2021) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30).

Defendants point to portions of Luethy's deposition testimony in which she purportedly agreed that she could not offer an opinion on correctional standards but, instead, was retained as an expert in nursing. Luethy Depo. pp. 42-43; 67; 82; 89; 94; 95; 101.  Luethy's report states that, in forming her opinion, she relied on her review of the materials and documents she listed in the Report, and her thirty-five years' experience in correctional health care.  Luethy Report, p. 3.

Defendants specifically object to the following portions of Luethy's report.

[…]

Although BL[2] should have been on Suicide Watch based upon his previous attempts, Futrell took him off suicide watch because his attempt was during his 20s. Removal of a patient from suicide watch should only be upon the consent of qualified mental health professionals.

[…]

Detainees rely on corrections and health care staff to grant them access to care, as they are unable to obtain care by themselves. Typically, this takes place through use of a written "Sick Call Request form."

Futrell states BL must be proactive in getting his own care through completing a Sick Call form.

---

[2] "BL" is the Decedent Brian Lawler.

> […]
>
> Sgt. Wiggins testifies she never called Quinco (mental health agency), even though she knew BL had a history of bi-polar disease.
> Wiggins testifies she would have let him scream until he stated he wanted to kill himself: only then would she have called Mental Health.
>
> […]
>
> Per her deposition, Sgt. Judy Wiggins planned to leave BL in the isolation cell without access to health care on Saturday, 7/28 until Monday, without personal items. All day 7/28, BL had "fussed and ranted and raved". He wanted to go to the ER. She states He was kicking and screaming.
>
> […]
>
> Wiggins rejected BL's request to see a doctor.
>
> […]
>
> Wiggins never called a medical authority or 911 even though BL was screaming from 11AM to 6:30 PM.

*Id.* pp. 3 & 4 (internal citations omitted). Defendants also object to Luethy's comment that Futrell testified in her deposition that the jail had no staff psychiatrist or psychologist and that she had no responsibility to get the Decedent medical help while he was in the jail.

Most of the allegedly objectionable statements are factual statements rather than opinions.[3] Luethy is entitled to reiterate facts that are in the record when rendering her opinion.[4] The only opinion in the above cited portions of her report is "[r]emoval of a patient from suicide watch should only be upon the consent of qualified mental health professionals." Defendants have failed to show how Luethy is not qualified to render this opinion. They have also not convinced the

---

[3] If Defendants claim that any of these factual statements are false, they may present testimony at trial showing as much.

[4] These factual statements relate to Defendants' alleged failure to provide the Decedent with proper access to medical and/or mental health care and are, therefore, relevant to the issues presented in this case.

12

Court that she is not qualified to render her opinions that the Decedent was denied proper access to care, the Decedent's serious medical needs were ignored or not taken seriously, and the disregard of the Decedent's serious medical needs was a breach of the standard of care.[5] However, at trial, Defendants may subject Luethy's opinions and her basis for those opinions to vigorous cross-examination.

Defendants also object to Luethy's opinions concerning the actions and inactions of Nurse Jill Shearon who is not a party to this action. Defendants argue that whether Nurse Shearon acted below the standard of care in providing care to the Decedent is irrelevant as to whether Hardeman County's policies caused a constitutional deprivation.  However, in the Sixth Circuit a plaintiff does not necessarily have to show individual liability in order to show municipal liability. *Compare Nichols v. Wayne Cnty., Michigan*, 822 F. App'x 445, 448 n.4 (6th Cir. 2020) ("It is an open question in this circuit 'whether a municipality's liability under § 1983 is predicated on first finding that an individual officer or employee is also liable.'"), *with Nichols*, 822 F. App'x at 459 (Moore, J., dissenting in part) ("There is no 'open question in this circuit,' about whether a plaintiff must first show individual liability in order to show municipal liability. Our controlling precedent says that there is no such requirement." (citations omitted)); *c.f. Whiting v. Trew*, 2021 WL 6618480, at *9 (E.D. Tenn. Dec. 22, 2021) ("The City alternatively argues that, '[b]ecause the City cannot be held liable under *Monell* unless there is liability for an individual actor, the City is entitled to summary judgment upon a grant of immunity to the individual Defendants.' However, the Sixth Circuit has held, '[u]nder the law of this circuit, a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to

---

[5] Plaintiff acknowledges that Luethy is not qualified to offer opinions concerning correctional standards for correctional officers; he maintains, however, that she is qualified to testify about healthcare issues regarding both medical staff and correctional staff, and the Court agrees.

qualified immunity.'" (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993))); *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 390 (6th Cir. 2018) (stating that in a subset of § 1983 cases, a finding that no individual defendant committed a constitutional violation does not necessarily relieve the municipality from liability and "the type of claim [plaintiff] advances — one premised on a failure to act rather than affirmative wrongdoing — might fit within this analysis"); *Epps v. Lauderdale Cnty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J. concurring) ("[A] finding that the individual government actor has not committed a constitutional violation does not require a finding that ... the municipality is not responsible for that constitutional harm.").

While Defendants are correct that Nurse Shearon's acts and omissions do not impose vicarious liability on her governmental employer, Plaintiff has alleged, *inter alia*, that the County and its employees were deliberately indifferent to the Decedent's serious medical needs. Luethy testified as to what she viewed as a practice or custom on the part of County employees to disregard inmates and detainees medical and mental well-being. She specifically testified

> There were protocols that were applicable on the day he came to jail and prot – and throughout, and protocols that became active or appropriate as he went through his time at the jail, and care and treatment never changed. Shearon didn't ever embrace the protocols, so to me, that shows a practice and a pattern of ignoring protocols.

Luethy Depo. p. 137.

Because Luethy's testimony is relevant to the issue of whether the County was deliberately indifferent to Lawler's serious medical needs, the Court will allow Luethy to testify as to what part Nurse Shearon's actions/inactions play in her opinion.

Next, Defendants contend that Luethy is not qualified to offer an opinion as to the cause of the Decedent's death. They specifically object to her opinion that their treatment of Decedent's medical needs "was a substantial factor in causing his death." Luethy Report, p. 5. While the Court agrees that Luethy cannot provide opinions regarding the cause of the Decedent's death which was

14

anoxic encephalopathy as the result of suicide and is undisputed, she may testify as to her opinion concerning actions or inactions of Defendants that had an effect on Decedent's death.

Finally, Defendants contend that Luethy's opinions should be limited to the extent that she seeks to offer legal opinions. They note that it is well-settled that an expert "may not testify to a legal conclusion" or "define legal terms." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014). Specifically, Defendants object to Luethy's conclusion that the treatment of Decedent's "serious medical needs" amounted to "deliberate indifference." *Id.* at p. 4. They argue that this opinion invades the province of the court in its determination of the applicable law and its instruction of that law to the jury. In support of their argument, Defendants rely, in part, on *Berry v. City of Detroit*, which held that the district court erroneously admitted expert testimony opining that certain conduct by the defendant amounted to "deliberate indifference" because it improperly expressed the ultimate legal conclusion at issue in the case. 25 F.3d 1342, 1353-54 (6th Cir. 1994).

Plaintiff has responded that Luethy is not attempting to offer legal opinions, but rather, at most, is offering opinions which encompass language regularly used in civil rights cases such as this one. Plaintiff argues that Luethy should be permitted to offer opinions consistent with her report and deposition testimony and points to the Federal Rules of Evidence which specifically provide that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Rule 704(a), Fed R. Evid.  Plaintiff reasons that, because Luethy explained and set forth the basis for her opinions, the use of the terms "serious medical needs" and "deliberate indifference" should be allowed. *See Fed. Prac. & Proc. Evid*. 6284 (2015) ("Courts… have overruled objections to testimony couched in legal terms by observing that a jury of lay persons would not be misled by the use of a legal term because its plain meaning in every day speech matches its legal meaning.")

15

In the present case, the Court finds that Luethy's use of the term "serious medical needs," in the context in which she used that term, is not an improper legal conclusion because its "plain meaning in every day speech matches its legal meaning," and she will be allowed to testify using that term because a jury would be familiar with that term from everyday life. However, the term "deliberate indifference" does not have an ordinary, everyday meaning. Instead, it is used in civil rights litigation as a legal term to assist the jury in determining whether a plaintiff's constitutional rights have been violated. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Therefore, at trial, Luethy will not be allowed to opine as to whether any of Defendants' actions or inactions constituted deliberate indifference.

In summary, Defendants' motion is denied except for the portion of the motion seeking to exclude Luethy's use of the term "deliberate indifference." That portion of the motion is granted. In all other aspects, Luethy may testify to the opinions she expressed in her report concerning Defendants' alleged failure to provide the Decedent with the healthcare that he needed.

## II.     Motion to Exclude Portions of Gravette's Opinions

The Court finds that Gravette has not offered opinion testimony outside the scope of his expertise. Gravette's testimony about Nurse Shearon and her failure to consult another medical professional was limited in its scope. Gravette did not testify that Nurse Shearon breached any standard of care or failed to act in accordance with nursing standards. Gravette specifically denied that he was offering medical opinion testimony or opining on whether Nurse Shearon's treatment satisfied the standard of professional care. Gravette simply stated that it was "contrary to accepted jail practices for Ms. Shearon to make [her treatment] decision without being required to seek guidance from a nurse practitioner or physician." Gravette Rep. 3 (ECF No. 70-2). Gravette's report went on to state that "nor did LPN Shearon follow up with a physician or other competent

16

medical authority when it was clear Lawler had a head injury to determine if Lawler's injury and his behavior warranted outside medical intervention." *Id*. at 6.  Gravette couched his opinion in terms of the appropriate policies for a correctional facility.  Gravette questions the fact that Hardeman County policy permitted Nurse Shearon to exercise her own discretion without consulting a supervising medical professional. Put another way, Gravette faults Hardeman County for giving a licensed practical nurse that much professional discretion and latitude.  While it presents a close question, faulting the county's policy granting a licensed practical nurse some leeway in the exercise of her discretion is not the same thing as calling into doubt the LPN's exercise of professional judgment under the applicable standard of nursing care. The Court finds that Defendants' argument for the exclusion of this portion of Gravette's testimony is not persuasive.

Turning then to Gravette's opinions concerning Gonzalez, Defendants have not shown why the testimony runs afoul of Rule 702.  Gravette's testimony was that Gonzalez failed to follow best correctional practices by not immediately contacting Decedent and directing him to remove the towel from his head and step down from a bench in his cell as soon as Gonzalez observed Lawler in this posture and before Gonzalez took out the trash.  According to Gravette, Gonzalez "could have prevented a suicide right there or caught him in the middle of attempting suicide and precious seconds could have been saved . . . ."  Gravette Depo. 87:16-19, May 6, 2022 (ECF No. 77-1).  Gravette's deposition testimony was consistent with a statement contained in Gravette's report that "[h]ad Gonzalez done these two simple things Lawler would not have been able to hang himself from the bolt protruding from the wall above the bench at that time."  Gravette Rep. 4 (ECF No. 70-2).

Defendants object to this portion of Gravette's opinion evidence, framing the issue as Gravette offering medical opinions about the cause of Brian Lawler's death. Strictly speaking, Gravette is not offering evidence that would meet the definition of "cause of death." "Cause of death" is commonly understood as "[t]he happening, occurrence, or condition that makes a person die" or "the injury, disease, or medical complication that results directly in someone's demise." Black's Law Dictionary (11th ed. 2019). Because "cause of death" is a highly technical concept and term of art, typically only physicians, medical examiners, or others with the specialized scientific training required to render causation opinions are qualified to opine on a "cause of death." And in this case Plaintiff has shown that the parties agree Brian Lawler's cause of death was suicide. Gravette offers competent testimony about the best practices in a correctional setting when an officer confronts a situation like the one Gonzalez confronted. Gravette assumes that Gonzalez and other jail staff would have had more time, albeit just minutes or seconds, to respond to the situation and treat Decedent. This is a permissible inference from the evidence that Gonzalez observed Lawler with a towel over his head (and assumed he was standing on a bench) and nevertheless went about his duties before returning to the cell to check on Decedent a second time.

To the extent Gravette goes further and assumes that an earlier intervention may have changed the outcome of this episode and saved Lawler's life, such an assumed fact can be permissible. "Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). The Court need not sort out whether Plaintiff has such proof. Defendants have not argued for the exclusion of Gravette's opinion because he assumes a fact not in evidence. Defendants have merely argued that Gravette cannot give testimony about the cause

of Brian Lawler's death. Having decided that Gravette's opinions do not concern "cause of death," the Court need not address the other assumptions underlying Gravette's opinion testimony about Gonzalez.

## CONCLUSION

Defendants' motion to exclude Luethy's opinion testimony under Federal Rule of Evidence 702 is **PARTIALLY GRANTED** and **PARTIALLY DENIED**, and their motion to exclude portions of Gravette's opinion testimony is **DENIED**.

**IT IS SO ORDERED.**

                                          **s/ S. Thomas Anderson**
                                          S. THOMAS ANDERSON
                                          CHIEF UNITED STATES DISTRICT JUDGE

                                          Date: September 29, 2022.